UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RICHARD GIBSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-02858-RLY-MPB |
| | ) | |
| CARRIAGE FORD, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Richard Gibson worked for Carriage Ford, Inc. as a sales manager for 33 years.  After management changed his position to sales associate, his relationship with Carriage Ford became damaged beyond repair.  He now brings this employment discrimination lawsuit against Carriage Ford, claiming Carriage Ford violated the Age Discrimination in Employment Act ("ADEA"), breached an employment contract, defamed him, and intentionally inflicted emotional distress upon him.  For the reasons explained below, the court **GRANTS in part** and **DENIES in part** Defendant's Motion for Summary Judgment.

## I.    Background

Carriage Ford is a family-owned automobile dealership located in Clarksville, Indiana.  (Filing No. 45-1, Deposition of Carriage Ford's 30(b)(6) Witness ("30(b)(6) Dep.") at 7; Filing No. 45-2, Deposition of Marty Book ("Marty Dep.") at 9, 75).  Earl Book is the dealership President, Martin ("Marty") Book is the Dealer Principal and Vice President, Dean Book is General Manager over the service department, and Doug Book is

1

Parts Manager overseeing the parts and body shop departments. (*Id.* at 19, 51; Filing No. 45-4, Deposition of Dean Book ("Dean Dep.") at 8; Filing No. 45-5, Deposition of Doug Book ("Doug Dep.") at 8). The Books are "a team together on any main decisions." (Marty Dep. at 20).

Carriage Ford hired Plaintiff as a member of its sales staff in 1985, at the age of 25. (Filing No. 45-3, Deposition of Richard Gibson ("Plaintiff Dep.") at 19-20). Plaintiff was promoted to sales manager, overseeing Carriage Ford's used car division. (*Id.* at 25). As a manager, Plaintiff's pay was a base monthly salary, plus a percentage of the gross new and used sales reflected on Page 5 or 6, Line 62 of Carriage Ford's financial statements, plus other bonuses based on units sold. Plaintiff's pay structure was documented in his employee files on Carriage Ford's Personnel Action Record ("PAR"). (*See* Filing No. 45-8, Personnel Action Record).

In 2016, after approximately 31 years of employment with Carriage Ford, Plaintiff approached Marty to discuss reducing his hours. (Plaintiff Dep. at 75; Marty Dep. at 318). Plaintiff wanted to work Monday through Friday from 9:00 a.m. to 5:00 p.m.—not nights and weekends—so he could spend more time with his family. (Plaintiff Dep. at 75-76). He wanted to sell to his own customers and make commissions[1] on those sales.

---

[1] Plaintiff filed an affidavit about six months after he was deposed. There, he testified he "always made clear that [he] wanted to remain a salaried employee, remain in a managerial role and maintain [his] managerial responsibilities." (Filing No. 56-1, Affidavit of Richard Gibson ¶ 2). He "did not request to work solely on commission, and [he] did not request to work as a salesman." (*Id.* ¶ 3). Plaintiff did not make those points clear in his deposition. Indeed, he testified that a proposal he discussed with Marty involved him giving up his managerial role. (Plaintiff Dep. at 76-77 ("Q: Your proposal also was – is that you would no longer manage staff, but you would recondition cars?  A: If that's what he would like for me to do, I would do that."). Plaintiff further testified that he was not aware of any other employment terms which were

(*Id.* at 75).  Marty responded, "Remind me again in a few months."  (*Id.* at 79).  Plaintiff "would go to him and he'd say, 'We're working on something.  We'll get you taken care of.  We're working on something for you.  We'll get you taken care of."  (*Id.*).

In October 2017, Marty was diagnosed with stomach cancer and took a leave of absence until March 2018.  (Marty Dep. at 26).  When Marty returned, he recognized that the sales department was not performing as it should be.  (*Id.* at 27-28).  He determined that the sales management team should run like a "motion offense."  (*Id.* at 168, 184-85, 248).  Each manager needed to "go to different spots and do different things."  (*Id.* at 184-85).  Marty testified Plaintiff "was limited in being in that motion because . . . his main area that he understood was used cars."  (*Id.* at 168-19).  Plaintiff did not know, for example, how to work a lease deal in the new car department.  (*Id.* at 169).

On April 5, 2018, Marty called Plaintiff into his office and informed him that "there was going to be some changes [at Carriage Ford], and part of it was going to be with him."  (Marty Dep. at 180).  Marty informed Plaintiff he was no longer the used car sales manager; his new role was sales associate, where he would receive a commission for each sale.  (*Id.* at 80-81; Plaintiff Dep. at 86).  Marty also informed Plaintiff that Chase Timberlake, a sales manager who is related to the Book family by marriage, would

---

discussed between him and Marty.  (*Id*. at 77).  But even if Plaintiff did make it clear he wanted to remain used car sales manager, Carriage Ford could not afford to pay him a salary plus commissions.  (Marty Dep. at 173 ("So he was requesting a desire to be – to work a part-time job and be paid sales commission plus be paid to recondition used cars.  We couldn't afford to do that.  That's – whoever is going to do – is going to recondition used cars has to be the used car manager and has to perform other duties."); 30(b)(6) Dep. at 252-53 ("[Plaintiff] wanted to keep a salary job, and he wanted to be paid commission, and that wasn't going to fly.")).

be taking on a Monday-Friday schedule, working 9:00 a.m. to 5:00 p.m., plus one weekend a month, in the new car department. (Marty Dep. at 196, 198; Plaintiff Dep. at 85-86). His salary was reduced to reflect fewer hours. (Marty Dep. at 197). When Plaintiff pointed out that was the work schedule he had requested previously, Marty said that was a "different situation" because Timberlake was going to quit. (Plaintiff Dep. at 85). Timberlake is more than 10 years younger than Plaintiff. (30(b)(6) Dep. at 242).

The following day, April 6, 2018, Plaintiff met with Marty in Marty's office and asked for his job back as used car sales manager. (Plaintiff Dep. at 90, 93; Marty Dep. at 221, 226). Marty would not reconsider the decision.  Marty said that "they were going to hire younger blood and pay them less money." (Plaintiff Dep. at 91). Despite being upset by the conversation, on April 9, Plaintiff told Marty he "was going to stay and try to sell." (*Id.* at 93, 100). Plaintiff would continue his duties as used car sales manager until April 17, at which time he would start his job as a sales associate. (*Id.* at 100). In his new role, Plaintiff received the opportunity to set his own hours, appraise his own trade-ins, and keep his company car. (Marty Dep. at 181-82, 222). These benefits were not offered to any other sales staff member. (*Id.* at 181-82, 290). Marty also told him he did not have to pay for insurance. (*Id.* at 257).

On April 13, 2018, Marty called Plaintiff and said, "Just go ahead and make today your last day.  We don't need you anymore as used car sales manager." (*Id.*; Marty Dep. at 223). Plaintiff asked for, and was granted, a three-week leave to clear his head. (Plaintiff Dep. at 100; Marty Dep. at 221, 226). Around that same time period, Marty promoted Nick Mattingly, a sales associate who is 14 years younger than Plaintiff, to the

position of sales manager in training.  (Filing No. 45-6, Deposition of Nick Mattingly ("Mattingly Dep.") at 42, 49; Plaintiff Dep. at 158 (testifying Mattingly told him he replaced him as used car manager); Filing No. 58-1, Mattingly's PAR).  Mattingly testified the promotion was for a trial period.  (Mattingly Dep. at 43 ("The conversation I had with Marty about this promotion is it was a trial period.  It didn't come with a title.  It was something, "We're going to put you in the spot, see how it works.").  Marty told Mattingly he would "like to see [him] down there in used [cars] because [he] [had] an inner working and understanding of what's going on down there, but that's down the road."  (Mattingly Dep. at 48).  Mattingly was supervised by Marty while he was in training.  (*Id*. at 50; Marty Dep. at 252-53).  Mattingly's pay was less than Plaintiff's pay as manager; he did not get a company car or "any other perks that came along with being a manager."  (Plaintiff Dep. at 160).

In April 2018, fellow sales manager Jeff Stirn, who was 56 years old at the time, began managing used car sales.  (Filing No. 45-7, Affidavit of Jeff Stirn ("Stirn Aff.") ¶ 5; Mattingly Dep. at 55-56; Marty Dep. at 252).  On days Stirn was not at Carriage Ford, sales managers Wes King and Derek Sherrell oversaw used car sales.  (Stirn Aff. ¶ 5; Marty Dep. at 252).  Marty returned Mattingly to sales in approximately October 2018.  (Mattingly Dep. at 56-57).

Following Plaintiff's three-week leave, Plaintiff told Marty that he would work only Tuesdays and Thursdays or by appointment.  (Plaintiff Dep. at 119; Marty Dep. at 222-23, 273, 275).  On his first day back to work (roughly May 8, 2018), Plaintiff tried to sell a car to a wholesaler, but Marty forbade the sale.  (Plaintiff Dep. at 110).  Plaintiff

testified a Carriage Ford employee sold it for $1,000 less than what he had offered.  (*Id.* at 116-17).  When Plaintiff complained, Marty explained that only sales managers can sell to wholesalers, and that he did not know other sales associates were selling directly to wholesalers.  (Marty Dep. at 276).  He quickly put a stop to it.  (*Id.* at 276-77).

In mid-May 2018, Marty told Plaintiff he was no longer eligible for health insurance and to go on his wife's health insurance.  (Marty Dep. at 256; Plaintiff Dep. at 133-35).  Only full-time employees of Carriage Ford are entitled to health insurance. (Marty Dep. at 257, 259).  Marty testified that when he told Plaintiff his insurance was free, he meant the automobile insurance on the company car, not health insurance.  (*Id.* at 256-57).

In May or June 2018, Marty also told Plaintiff he was no longer eligible for split sales.  (*Id.* at 269).  A split sale occurs when a customer comes into the dealership asking for a specific sales staff member, but that sales staff member is not available to assist the customer.  If another sales staff member makes the sale, the commission is split between the sales staff member the customer originally asked for and the sales staff member who made the sale.  (Plaintiff Dep. at 43).  Marty explained that allowing Plaintiff to take a split-sale would not be fair to the full-time sales staff.  (Marty Dep. at 269 (testifying it would be difficult to keep sales employees "if you're going to take half their deals and give it to somebody that's not working near the hours that they're putting in"); *see also id.* at 300 (stating he told Plaintiff he would only be guaranteed split sales if he worked full time); 30(b)(6) Dep. at 212-13 ("Carriage Ford has a rule that if you're not going to work

a full weekly salesperson's shift, that you're not going to be entitled to half a deal     . . .
And [Plaintiff] understood that.").

On June 8, 2018, Marty met with Plaintiff one-on-one to discuss the issue of split-
sales.  (Filing No. 45-11, Audio Recording Transcript ("Audio Tr.") at 2).  Before
entering Marty's office and without Marty's knowledge or consent, Plaintiff turned on his
mobile phone and recorded the conversation.  (*Id.*; Plaintiff Dep. at 125, 130).  Marty
reminded Plaintiff he was not eligible for split sales.  (Audio Tr. at 2).  He also instructed
Plaintiff to make sure sales managers and sales staff knew what his schedule was and that
they were to call him [Plaintiff] when his customers came to give him the option to make
the sale.  (*Id.* at 2-3).  In response to Marty's comments, Plaintiff resigned effective
immediately.  (*Id.* at 3, 8, 9).  Plaintiff testified he was "run off":

> Taking away the insurance, not letting me sell a car, telling me I can't have a
> split deal, that's just trying to run me off.  It's something different than every
> other person that works there—every other salesperson that—that they have,
> different than every one of them.

(Plaintiff Dep. at 139).

Plaintiff was not removed from Carriage Ford's health insurance until June 30,
2018.  (Filing No. 45-15, Email from health insurance carrier).

All other facts necessary to a resolution of this motion will discussed *infra*.

## II.    Summary Judgment Standard

Summary judgment is appropriate when the record shows that there is "no genuine
dispute as to any material fact" and that the "movant is entitled to a judgment as a matter
of law."  Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court

may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the evidence. *Johnson v. Advocate Health & Hosp. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). Instead, the court must construe the facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Id*. A genuine dispute as to a material fact exists if, based on the evidence presented, a reasonable jury could find in favor of the non-moving party. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016).

## III.    Discussion

### A.    Age Discrimination Claim

The ADEA prohibits an employer from discriminating against an employee due to the employee's age. 29 U.S.C. § 623(a)(1). Under a disparate treatment theory, an ADEA plaintiff must establish that his age was the "but-for cause" of his termination. *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012). This requires the plaintiff to show that his age was not just a motivating factor in the employer's decision to terminate him; he must show it was the *determinative* factor. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009); *Lindsey v. Walgreens*, 615 F.3d 873, 876 (7th Cir. 2010).

The parties analyze the evidence under the familiar *McDonnell Douglas* burden-shifting method. This requires the plaintiff to establish four elements: (1) he was a member of a protected age group (forty or older); (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were substantially younger were treated more

favorably. *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 475 (7th Cir. 2008). "Substantially younger" generally means ten years younger than the plaintiff. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 322 (7th Cir. 2003). If the plaintiff establishes a prima facie case, the burden shifts to the employer to come forward with a legitimate, non-discriminatory reason for failing to hire him. *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 716 (7th Cir. 1999). If the employer provides such a reason, the plaintiff must show the employer's proffered reason was a pretext for age discrimination. *Id.*

### 1.    Prima Facie Case

The first two elements are not in dispute. Therefore, the court will begin its discussion with whether Plaintiff suffered an adverse employment action.

### a.    Adverse Employment Action

There are two employment actions at issue. The first occurred on April 5, 2018, when Plaintiff's title changed from used car sales manager to sales associate. The second occurred on June 8, 2018, when Plaintiff left—or was constructively discharged—from his employment.

An adverse employment is "defined quite broadly in this circuit." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). Although there is no precise definition, an adverse employment action must be materially adverse, which means it must be "more than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank and Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993). Examples of adverse employment actions include "'termination, a demotion evidenced by a decrease in wage

or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities.'" *Id.*

Plaintiff's management position paid a salary plus a percentage of gross sales, whereas his sales associate position paid on a commission basis only. Carriage Ford argues Plaintiff did not suffer an adverse employment action when his position changed from used car sales manager to sales associate because Plaintiff's change of position would not necessarily result in lesser pay. Indeed, Marty testified that one sales associate (ironically named Duane Money) made more than the sales managers for three years straight. (Marty Dep. at 175). That means, however, that all other sales associates made less money than sales managers. Consequently, the court finds this fact is insufficient to show Plaintiff was not subject to an adverse employment action.

Carriage Ford also argues that Plaintiff requested that he be moved into a sales position. Plaintiff testified that in 2016, he sought a position where he could work less hours, sell to his own customers, and make commissions. (Plaintiff Dep. at 75). Plaintiff understood that "[m]anagers do not get paid commission." (*Id.* at 74). Furthermore, as a salesman, he got perks other sales associates did not receive, such as a company car and the ability to set his own schedule. (*Id.* at 77, 119). On these facts, the court finds he has failed to establish his reassignment from a managerial position to a sales position was an adverse employment action.

The second employment action occurred on June 8, 2018. Plaintiff maintains he was constructively discharged from Carriage Ford "due to [Carriage Ford's] unreasonable

and unfair payment constructs and his removal from [Carriage Ford's] insurance

coverage." (Filing No. 56, Resp. at 23). Carriage Ford maintains he voluntarily resigned.

"An employer constructively discharges an employee only if it makes an

employee's working conditions so intolerable that the employee is forced into an

involuntary resignation." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 536–37 (7th Cir.

1993) (quoting *Weihaupt v. Am. Medical Ass'n*, 874 F.2d 419, 426 (7th Cir. 1989)). This

standard is met if a reasonable employee would have felt compelled to resign. *Rabinovitz*

*v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996). To succeed on this claim, a plaintiff must

establish not only that his working conditions were intolerable; he must establish they

were intolerable because of unlawful discrimination. *Drake v. Minn. Min. & Mfg. Co.*,

134 F.3d 878, 886 (7th Cir. 1998). This is a high bar for a plaintiff to meet. *Porter v.*

*Erie Foods Int'l, Inc.*, 576 F.3d 629, 639-40 (7th Cir. 2009). "Working conditions for

constructive discharge must be even more egregious than those that would support a

finding of a hostile work environment; absent extraordinary circumstances, an employee

is expected to remain employed while seeking redress." *Id.* (quoting *Witte v. Wis. Dep't*

*of Corr.*, 434 F.3d 1031, 1035-36 (7th Cir. 2006)). The Seventh Circuit has found

intolerable working conditions where, for example, plaintiff's "allegations include[d]

repeated use of a noose—perhaps the ultimate symbol of racial hatred and hate crimes—

combined with threats of physical violence." *Id.*

Here, Plaintiff asserts he was denied split sales, denied a sales commission to a

wholesaler, and was told he could not be on Carriage Ford's health insurance any longer

because he was a part-time employee. Although Plaintiff felt he was treated unfairly,

these allegations fall far short of the type of intolerable working conditions which would qualify his resignation as a "fitting response." *Id.* at 639.  Therefore, the court finds Plaintiff's resignation was not tantamount to a constructive discharge.

### b. Similarly Situated Individuals

Assuming for the sake of argument that Plaintiff had established he was subjected to an adverse employment action (or actions), the court turns to whether Plaintiff was replaced as used car sales manager by a substantially younger employee.  Plaintiff argues he was replaced by Nick Mattingly, who was fourteen years his junior.  Carriage Ford argues he was replaced by Jeff Stirn, who was the same age as Plaintiff.

The record reflects that Jeff Stirn immediately absorbed Plaintiff's managerial duties and began overseeing used car sales.  (Stirn Aff. ¶ 5; *see also* Mattingly Dep. at 55-56 (testifying Stirn moved into Plaintiff's office)).  When Stirn was not available, Wes King and Derek Sherrell filled in.  (Stirn Aff. ¶ 5).  At the same time, Mattingly's promotion was for a "trial period" and did not come "with a title."  (Mattingly Dep. at 43-44).  As Plaintiff acknowledged, Mattingly was paid less than other managers and did not receive many of the perks of management, such as a company car.  (Plaintiff Dep. at 160 (stating Marty told him that Mattingly did not get a company car, company-paid gas, or any other perks of management)).

Plaintiff also claims Chase Timberlake, who is more than 10 years younger than Plaintiff, was treated more favorably than he was because Timberlake received a 9:00 a.m. to 5:00 p.m. Monday-Friday schedule—a request Plaintiff had made before.  But Plaintiff was afforded the opportunity to make his own schedule and could have worked

from 9:00 a.m. to 5:00 p.m. Monday through Friday too.  (Marty Dep. at 222).  He chose to work Tuesdays and Thursdays from 9:00 to 5:00 or by appointment.  (*Id.* at 222-23, 273, 275).  Plaintiff wanted to make commissions on each sale, which meant moving out of management and becoming a member of the sales staff.  (Plaintiff Dep. at 75; Mattingly Dep. at 43).

Plaintiff and Timberlake were also differently situated.  Timberlake was a member of the Book family by marriage.  (Marty Dep. at 198, 228).  Timberlake was also the most productive sales manager at Carriage Ford.  (30(b)(6) Dep. at 242-43, 245, 252; *Id.* at 197-98).  Timberlake was offered the reduced schedule as a means to keep him employed at Carriage Ford.  (Plaintiff Dep. at 85).

Plaintiff has therefore failed to establish a prima facie case of age discrimination. For the sake of completeness, though, the court will address the issue of pretext.

## 2.    Pretext

Carriage Ford maintains it reassigned Plaintiff from a management position to a sales associate position because it was restructuring its managerial staff and Plaintiff wanted to work fewer hours on a commission basis.  This is a legitimate, non-discriminatory reason.  The issue is whether that reason is a pretext for age discrimination.  "A plaintiff can establish pretext 'directly with evidence that [an] employer was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible.'"  *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 323 (7th Cir. 2001) (quoting *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999)).  Pretext does not address the issue of whether the employer's

employment decision was correct; "[r]ather, it addresses the issue of whether the employer honestly believes in the reasons it offers." *Id.* (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).  Thus, the ultimate inquiry is whether Carriage Ford honestly believed in the reasons it advanced for reassigning Plaintiff to a sales associate position.

Plaintiff points to Marty's comment that Carriage Ford was "going to hire younger blood and pay them less money" as evidence of age bias.  Such comments are indicative of age discrimination if the decision-maker expresses "such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652 (7th Cir. 2000).  According to Plaintiff, Marty made this comment when Plaintiff asked for his sales manager position back.  (Gibson Dep. at 91).

But as Carriage Ford points out, Marty was not the sole decision-maker, as all decisions regarding the dealership were joint decisions made by the Book family.  (Marty Dep. at 20) (testifying that when it comes to making "an ultimate decision on anything, when it comes to any sort of management or anything like that, we talk together.").  Earl Book, who was 89 years old at the time Plaintiff moved positions, testified his sons discussed with him whether the business should move Plaintiff into a sales associate role.  (Earl Book Dep. at 14).  Earl agreed with the decision to have Plaintiff step down as used car sales manager because Plaintiff "had been insisting on less responsibility." (*Id.* at 14; *see also* Doug Dep. at 24 (testifying the family discussed Plaintiff's request to work fewer hours "and step back into sales" two or three times); Dean Dep. at 33-34 (testifying he

14

was not actively involved in the decision to reassign Plaintiff but that "there was talk of [Plaintiff] wanting to slow down, semi-retire, whatever you want to call it . . . a couple years before")).  Because the family had collectively decided to move Plaintiff to a position as a sales associate, Marty did not need to consult with them again the following day to deny Plaintiff request for his job back.  (Doug Dep. at 25-26).  The collective nature of the decision made by a family of men all well over the age of 40[2] undercuts an inference that Marty's alleged age bias was the driving factor behind the decision to reassign Plaintiff to a sales associate role.  The fact that Plaintiff was replaced by someone of his own age further undercuts any inference of age discrimination.  *See, e.g., O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) (stating "an inference [of age discrimination] cannot be drawn from the replacement of one worker with another worker insignificantly younger").

Even if Marty told Plaintiff in April 2018 that he wanted "younger blood" and even if he made the decision on his own, Plaintiff can at most establish his age was a motivating factor in the decision to reassign him.  To establish liability under the ADEA, however, Plaintiff had to show his age was the *determinative* factor.  *Gross*, 557 U.S. at 180; *Lindsey*, 615 F.3d at 876.  As stated previously, Plaintiff repeatedly asked for a job with fewer hours and the ability to sell to his customers on a commission basis.  (Plaintiff Dep. at 75).  Carriage Ford ultimately allowed him to set his own hours and make commissions from his sales.  Consequently, for this and the other reasons advanced by

---

[2] In April 2018, Marty, Doug, Dean, and Earl were the ages of 46, 48, 52, and 89, respectively. (Marty Dep. at 7; Doug Dep. at 5; Dean Dep. at 5; Earl Dep. at 4-5).

Carriage Ford, the court finds Plaintiff fails to establish pretext.  Carriage Ford's Motion

for Summary Judgment on Plaintiff's ADEA claim is therefore **GRANTED**.

### B.    State Law Claims

Plaintiff also brings state law claims for breach of contract, intentional infliction of

emotional distress, and defamation.  Because the court has dismissed the sole claim over

which it has original jurisdiction, the court must determine whether it should take

supplemental jurisdiction over these state law claims.  28 U.S.C. § 1367(c)(3).  The

choice to retain jurisdiction is a matter of the court's discretion.  *Groce v. Eli Lilly & Co.*,

193 F.3d 496, 500 (7th Cir. 1999).

The court elects to retain supplemental jurisdiction over the supplemental state law

claims because they arise out of the same set of facts—those regarding his employment

with and resignation from Carriage Ford—as his age discrimination claim.  Moreover,

this case has been pending for almost two years.  Sending this case back to state court

would result in substantial duplication of effort.  Accordingly, the court now turns to

Plaintiff's breach of contract claim.

### 1.    Breach of Contract

Plaintiff argues his Personnel Action Record ("PAR") set forth the terms and

conditions of Plaintiff's pay, and that Carriage Ford breached the terms of that agreement.

(*See* Filing No. 45-8, PARS).  Carriage Ford disagrees, contending Plaintiff has not

alleged any of the exceptions exist to convert the PARs into an employment contract.

Plaintiff was an at-will employee.  "Indiana follows the doctrine of employment

at-will, under which employment may be terminated by either party at will, with or

without a reason." *Harris v. Brewer*, 49 N.E.3d 632, 639 (Ind. Ct. App. 2015).  In *Orr v. Westminster Village North*, 689 N.E.2d 712, 717 (Ind. 1997), the Indiana Supreme Court identified three exceptions to avoid or rebut the presumption of at-will employment: (1) the employee establishes that "adequate independent consideration" supports the employment contract; (2) if a clear statutory expression of a right or duty is contravened; and (3) if the doctrine of promissory estoppel applies.  *Id.* at 718.  These exceptions to the at-will employment doctrine do not apply here because Plaintiff is not suing under Indiana law for wrongful discharge.  *See id.* at 722 ("We re-affirm the vitality of the employment-at-will doctrine in Indiana and the general rule that adequate independent consideration is necessary to convert an at-will relationship into an employment relationship requiring an employer to discharge an employee for good cause."); *Whinery v. Roberson*, 819 N.E.2d 465, 472 (Ind. Ct. App. 2004) ("An at-will employee may not sue in contract for wrongful termination.").  Rather, he is suing for breach of an employment contract.  *Whinery*, 819 N.E.2d at 472 ("Parties in an employment at will relationship have no less of an interest in the integrity and security of their contract than do the parties in any other type of contractual relationship.") (quoting *Bochnowski v. Peoples Fed. Sav. & Loan Ass'n*, 571 N.E.2d 282, 284 (Ind. 1991)).  Here, Carriage Ford concedes that the "PARs set forth [Plaintiff's] compensation."  (Filing No. 45, Def.'s Mem. at 23).  Plaintiff accepted these terms by continuing to work for Carriage Ford.  These terms are therefore enforceable for the duration of the at-will relationship.  *Mart v. Forest River, Inc.*, 854 F.Supp.2d 577, 594 (N.D. Ind. 2012) (stating "the terms of an at-

will employment relationship are enforceable as long as the at-will employment

relationship continues").

> Plaintiff's most recent PAR reflects the following terms:
>
> $450.00 a week salary
>
> 3 ½% new and used selling gross page 5 line 62 of F/S [Financial Sheet]
>
> Used vehicles monthly sales bonus of retail 100 or more used units and
> receive a bonus of $500.00.  Any month with 100 or more used units
> following the previous month of 150 or more used units and the bonus will
> increase to $1,000

(Filing No. 45-8, PAR at 6).  As shown above, Plaintiff's pay structure consisted of a set

salary, plus a percentage of the new and used selling gross at the end of the month.  This

gross figure is referred to as Line 62 of Carriage Ford's financial statements.  Line 62 is

calculated by taking new and used car sales less expenses.  (Filing No. 45-13, Deposition

of Bertha Adkins at 43).

Plaintiff argues that Carriage Ford breached the terms of the PAR by subtracting

the finance manager's monthly bonus from Line 62 before calculating the sales' managers'

bonuses.  Carriage Ford's 30(b)(6) witness, Alex Boone, testified that the finance

manager's bonus was subtracted before Plaintiff's 3.5% new and used selling gross for

April 2017 was calculated.  (30(b)(6) Dep. at 99 ("Q: And then [Plaintiff's] 3.5 percent

comes from that number where [the finance manager's] pay is netted out, correct?  A:

That's where that $3,606 is coming from.  Q: So it is, it is net of [the finance manager's]

pay toward that. Correct?  A: That's what it looks like, yes.").  Plaintiff argues the finance

fee deduction from Line 62, which was taken out before the calculation of Plaintiff's own

monthly percentage, was not in Plaintiff's PAR and resulted in less pay than what was agreed upon.

Carriage Ford responds that even if it breached the terms of the PAR, Plaintiff was not damaged because Carriage Ford paid its sales managers, including Plaintiff, volume growth business ("VGB") money that it received from Ford. (*Id.* at 100). Boone testified that Carriage Ford adds the VGB money into the new and used selling gross calculation and "you don't see that either" in the April 2017 month end bonus sheet. (*Id.*).

Following his deposition, Boone reviewed Carriage Ford's financial records from September 2013 to April 2019. (Filing No. 63-1, Supplemental Affidavit of Alex Boone ¶ 2). He found that Plaintiff was entitled to $5,977.74 additional compensation if Carriage Ford had calculated his bonus without reducing Line 62 by the bonus amount paid to the finance manager. (*Id.* ¶ 6). But he claims Plaintiff was paid $7,592.00 in VGB bonuses not required under the PARs. (*Id.*). There was also a calculation error that resulted in Plaintiff being overpaid by $37.00. (*Id.* ¶ 3). Therefore, Carriage Ford concludes, Plaintiff received an overpayment from Carriage Ford of $1,651.26. (*Id.* ¶ 6).

In his sur-reply, Plaintiff takes issue Carriage Ford's use of VGB money to cancel out any damages it may owe him, claiming the VGB money from Ford is separate from the compensation he is entitled to receive pursuant to the PAR. Plaintiff also takes issue with Boone's calculations, noting he fails to explain where the figures he inputted into his financial summary originated. Lastly, Plaintiff notes he has received Carriage Ford's financial records dating back to 2013, but nothing before.

With so much uncertainty on how Plaintiff was paid—whether the finance manager's bonus was subtracted every month from gross sales, whether the VGB bonus was separate from his pay structure, whether Boone's calculations are accurate based on the records, and whether Plaintiff is owed money prior to 2013—the court must find a genuine issue of material issue of fact on Plaintiff's breach of contract claim. Carriage Ford's motion for summary judgment on this claim is therefore **DENIED**.

### 2.     Intentional Infliction of Emotional Distress

Plaintiff's final claim is for the tort of intentional infliction of emotional distress. This tort is defined as "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991). To prevail, a plaintiff must establish that the defendant: (1) engaged in extreme and outrageous conduct (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another. *Westminster Presb. Church of Muncie v. Cheng*, 992 N.E.2d 859, 870 (Ind. Ct. App. 2013). The intent to harm one emotionally is the basis of the claim. *Id.*

> The cases . . . have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539, 550 (Ind. Ct. App. 2015)

(quoting Restatement (Second) of Torts § 46 cmt. D (1965)).

Here, Plaintiff testified Marty engaged in extreme and outrageous conduct by

"putting [him] through what he put [him] through, putting [him] down.  By cutting [his]

feet out from under [him] to make a living.  By giving that company 33 years of [his] life,

of missing [his] kids growing up, of missing ball games, of missing a whole lot of family

time."  (Plaintiff Dep. at 170).  Plaintiff described Marty as a micromanager who

"changed the goal posts, per se, in the middle of the game all the time."  (*Id*. at 171).

Following his resignation, Plaintiff became depressed and felt as though he had no self-

worth.  (*Id.* at 23).  He eventually saw a therapist who diagnosed him with major

depressive disorder.  (Filing No. 50 at 11).

Giving the Plaintiff the benefit of all reasonable inferences that can be drawn from

the evidence, the court finds he was not the victim of extreme and outrageous behavior.

Plaintiff asked for years to work less hours and sell directly to his customers.  (Marty

Dep. at 172-73, 177, 318, 321, 323; Plaintiff Dep. at 75).  As a result, Marty moved

Plaintiff from his position as sales manager and allowed Plaintiff to set his own schedule

as a member of the sales staff.  (Marty Dep. at 27, 176).  Carriage Ford offered Plaintiff

to ability to work full-time, but he rejected the offer.  (*Id.* at 300).  Instead, Plaintiff chose

to work part-time, which meant he lost the ability to do split sales.  (*Id*. at 118, 269, 273-

75, 300; 30(b)(6) Dep. at 211-13).  However, due to his 33 years of service to Carriage

Ford, Marty permitted Plaintiff to retain other benefits, like his company car, that were

not offered to non-managers.  (Marty Dep. at 181-82, 290).  Any negative consequences

Plaintiff suffered by working part-time were a result of his own conduct.  Consequently, the court **GRANTS** Carriage Ford's motion for summary judgment on Plaintiff's intentional infliction of emotional distress claim.

### 3.    Defamation

Plaintiff's final claim is that Carriage Ford "made communications with defamatory imputations when it told Plaintiff's prospective employers lies about his work history and unlawful firing from Carriage Ford."  (Filing No. 30, Am. Compl. ¶ 57). Carriage Ford argues Plaintiff is unable to establish the elements of either defamation *per se* or defamation *pro quo* because he cannot identify what defamatory comments were made about him or who those comments were made to.  Plaintiff failed to respond to Carriage Ford's argument.  Accordingly, Carriage Ford is entitled to summary judgment on this claim.  *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017) ("Failure to respond to an argument generally results in waiver.")

## IV.    Conclusion

Pursuant to Rule 56, the court **GRANTS in part** and **DENIES in part** Defendant's Motion for Summary Judgment (Filing No. 44).  The Motion is **GRANTED** with respect to Plaintiff's age discrimination, defamation, and intentional infliction of emotional distress claims and **DENIED** with respect to Plaintiff's breach of contract claim.

**SO ORDERED** this 27th day of August 2020.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.